**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**MITCHELL WASHINGTON, Individually, and
As Personal Representative on Behalf of the Wrongful
Death Beneficiaries of the Estate of DEMETRIOS
DESHUN WASHINGTON, Deceased**                    **PLAINTIFF**

**v.**                         **CIVIL ACTION NO.** 3:25-cv-698-DPJ-ASH

**MANAGEMENT & TRAINING CORPORATION ("MTC"),
and JOHN AND JANE DOES 1-100**                    **DEFENDANTS**

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

*Jury Trial Demanded*

1. This Complaint is brought by MITCHELL WASHINGTON, Individually, and as Personal Representative on Behalf of the Wrongful Death Beneficiaries of the Estate of DEMETRIOS DESHUN WASHINGTON, by and through counsel, against Defendants Management & Training Corporation ("MTC"), and John and Jane Does 1-100.

**JURISDICTION AND VENUE**

2. Jurisdiction is appropriate in federal court pursuant to 28 U.S.C. § 1331 and 1343. Original subject matter jurisdiction is invoked under § 1331 since a federal question is raised under 42 U.S.C. § 1983, as well as the Eighth Fourteenth Amendments to the United States Constitution. Supplemental and pendent jurisdiction for state law claims related to original jurisdiction claims is proper under 28 U.S.C. § 1367(a) and *F.R.C.P.* 18(a).

3. Venue is proper under 28 U.S.C. § 1391(b), as all substantial acts and/or omissions occurred in Lauderdale County, Mississippi, in the Northern Division of the Southern District of Mississippi.

## PARTIES

4. Mitchell Washington ("Plaintiff") is an adult resident citizen of Hinds County, Mississippi. His current residence is 512 Wolcott Circle, Ridgeland, Mississippi 39157. Plaintiff, the natural brother of Demetrios Washington, deceased, brings this action individually and on behalf of the wrongful death beneficiaries of Demetrios Washington.[1]

5. At all times material to this Complaint, Demetrios Deshun Washington ("Decedent") was a 28-year-old adult resident citizen of Mississippi, and a prisoner incarcerated at East Mississippi Correctional Facility ("EMCF"), Meridian, Lauderdale County, Mississippi. Substantial acts, omissions, and events which caused Decedent's death took place in Lauderdale County. Plaintiff, as personal representative, brings this action pursuant to the Wrongful Death Statute and Survival Statute, *Miss. Code Ann.* §§ 11-7-13 and 91-7-233.

6. Management & Training Corporation ("MTC" or "Defendant") is a national for-profit prison operator incorporated in Delaware with its headquarters in Utah. MTC is the third-largest prison management company in the United States, operating 21 correctional facilities in the country, with 17 state correctional department contracts and 7 federal correctional agency contracts. MTC contracted with Mississippi Department of Corrections ("MDOC") for the management and oversight of prisons' daily operations, under which it had the responsibility to provide humane care and treatment consistent with all constitutional and ACA standards. At all times material herein, MTC managed EMCF,

---

[1] On February 4, 2025, Lauderdale County Chancery Court entered its *Decree Granting Letters of Administration and Determining Statutory Heirs at Law and Wrongful Death Beneficiaries of Demetrios Deshun Washington, Deceased* [DOC# 14], finding the sole, true, and lawful heirs at law and statutory wrongful death beneficiaries of Demetrios Washington to be: Mitchell Washington, surviving adult maternal half-brother of Demetrios Washington; Mildred Washington-Simpson, surviving natural mother of Demetrios Washington; Corinthian Washington, surviving adult maternal half-brother of Demetrios Washington; Charles Washington, surviving adult maternal half-brother of Demetrios Washington; Christopher Bailey, surviving adult maternal half-brother of Demetrios Washington; and Abrien Washington, surviving adult maternal half-brother of Demetrios Washington.

      and the acts, omissions, and events giving rise to this Complaint occurred under MTC's management. MTC is subject to the *in personam* jurisdiction of the Court by service of process upon its appointed registered agent, CT Corporation System, 8927 Lorraine Road, Suite 204-A, Gulfport, Mississippi 39503.

7. John and Jane Does 1-100 ("Doe Defendants") are unknown individuals, and/or entities liable to Plaintiff for the acts and omissions alleged herein. Currently, Plaintiff is ignorant as to the identities of Doe Defendants, who are unknown MTC officers, employees, agents, and/or servants. Plaintiff will amend this Complaint to allege their true names and that each of the fictitiously-named Defendants are responsible in some manner and liable to Plaintiff by reason of negligence, wanton and reckless misconduct, breach of warranty and/or another manner whether alleged herein or not, and by such wrongful conduct, each Defendant proximately caused Decedent's death and Plaintiff's damages complained of herein. Plaintiff, upon information and belief, asserts Doe Defendants were officers, agents, servants, and/or employees of Defendant, and acted with permission and consent within the course and scope of said agency and employment.

8. At all times relevant, Defendants acted under the color of the law, statutes, customs, ordinances, and usage of the State of Mississippi, pursuant to its contract with MDOC.

## FACTS

9. Plaintiff incorporates all allegations in Paragraphs 1 through 8 hereinabove.

10. On or about June 29, 2023, Demetrios Washington ("Decedent") was found unresponsive in his cell of Housing Unit 7, a/k/a "Camp Support" at EMCF. Officers reportedly discovered Decedent on his knees with his head in the toilet, with water, vomit, and food

around his mouth. Metro pronounced Demetrios deceased at approximately 5:06 p.m. The cause of death was determined to be Acute Electrolyte Imbalance.

11. Decedent's death was a direct and foreseeable result of Defendants' systemic failures including understaffing and inadequate training and supervision of officers. Decedent's death reflects Defendants' ongoing failure to protect mentally ill inmates from harm and self-harm, failure to maintain sufficient staff, and failure to adequately train and supervise staff. [2]

### *EMCF's History of Chronic Understaffing and Deliberate Indifference*

12. Plaintiff incorporates all allegations in Paragraphs 1 through 11 hereinabove.

13. Numerous lawsuits[3] and reports documented Defendants' chronic understaffing and its direct result in harm and/or death to inmates housed at EMCF. Defendants were on repeated notice that chronic understaffing at EMCF created unconstitutional and life-threatening conditions for prisoners housed at the facility.

---

[2] In November 2022, State Auditor Shad White announced his office was demanding nearly $2,000,000 from MTC for failure to adequately staff Marshall County Correctional Facility. The Marshall Project published MTC should have repaid $950,000 for vacant positions/unfilled shifts at EMCF from 2013 through 2019. MTC's prisons are often understaffed and employ 'ghost workers,' who are absent employees, allowing MTC to profit rather than employ an adequate number of staff members to keep their prisons safe. "State Auditor Demands Over $1.9 Million from Private Prison Operator," Nov. 14, 2022, https://www.osa.ms.gov/news/state-auditor-demands-over-19-million-private-prison-operator; "Mississippi Demands $1.9 Million from MTC for Short-Staffing Private State Prison," Jan. 1, 2023, https://www.prisonlegalnews.org/news/2023/jan/1/mississippi-demands-19-million-mtc-short-staffing-private-state-prison/; "3 wrongful death lawsuits and allegations of pocketing state funds hit Utah-based private prison company," Sept. 21, 2023, https://www.deseret.com/utah/2023/9/21/23882984/utah-private-prison-company-mississippi-mtc-management-and-training/; "Mississippi Prisons: No One's Safe, Not Even the Guards," Feb. 20, 2020, https://www.themarshallproject.org/2020/02/20/mississippi-prisons-no-one-s-safe-not-even-the-guards; "State Auditor Investigation Leads to $5 Million Recovery," Sept. 18, 2023, https://www.osa.ms.gov/news/state-auditor-investigation-leads-5-million-recovery.

[3] See *Dockery, et. al v. Epps, et. al*, S.D. Miss., No. 3:13-cv-326; *Gipson v. Management & Training Corporation et al*, S.D. Miss., No. 3:16-cv-00624; *Buckley et al v. Management & Training Corporation et al*, S.D. Miss., No. 3:22-cv-00379; *Marsh v. Management & Training Corporation et al*, S.D. Miss., 3:24-cv-00339; *Gregory Rivers v. Management & Training Corporation et al.*, S.D. Miss., 3:25-cv-156; *Jamela Carthan v. Management & Training Corporation et al*, S.D. Miss., No. 3:25-cv-163. See also *Walker v. Management & Training Corporation et al*, S.D. Miss., No. 5:14-cv-00098; *Bell v. Management & Training Corporation et al*, S.D. Miss., No. 5:16-cv-00039; *Hernandez v. Management & Training Corporation et al*, S.D. Miss., No. 5:16-cv-000057; *Mauk v. Management & Training Corporation et al*, S.D. Miss., No. 5:18-cv-000068.

14. EMCF was designated to house Mississippi's most severely mentally ill inmates requiring high-level care. Despite years of instability evidenced by frequent inmate assaults and deaths, lockdowns, and contraband, Defendants continued to operate EMCF under such dangerous conditions, displaying a deliberate indifference to the risk of harm and death to inmates. MTC's *de facto* policy of understaffing EMCF with inadequately trained officers who were left unsupervised, directly resulted in harm to inmates, specifically Decedent.

15. Proper supervision of inmates to prevent harm and/or death is impossible without sufficient staff. Defendants consistently understaffed EMCF with poorly trained and unsupervised officers, resulting in negligent practices that endangered inmates, including failure to conduct routine security rounds and inmate counts as required by policy. Defendants' *de facto* policy of understaffing EMCF with inadequately trained and unsupervised guards was negligent and grossly negligent and was implemented with deliberate indifference to the safety and well-being of inmates, specifically Decedent.

16. In 2013, a federal class action lawsuit against EMCF alleged unconstitutional conditions of confinement in violation of inmates' Eighth Amendment rights, citing failure to maintain sufficient staff, failure to remove weapons from inmates, failure to ensure proper safety-equipment functions, and failure to remove inmates from dangerous situations.[4] On June 29, 2023, the same failures as described in *Dockery* caused Decedent's death.

17. Eldon Vail, the Plaintiffs' corrections expert in *Dockery*, provided numerous expert reports which put Defendants on notice that understaffing EMCF resulted in harm and/or death to inmates housed at the facility. Vail's 2014 report warned Defendants that EMCF "is an extraordinarily dangerous prison," where "all prisoners are subjected on a daily basis to

---

[4] *Dockery et al v. Epps et al*, S.D. Miss., 3:13-cv-326, DOC# 1, *Complaint*.

significant risk of serious injury," due to the lack of adequate staffing.[5] Vail emphasized that understaffing prevented officers from performing basic security rounds, controlling violence, or providing medical and mental health care. Vail's 2016 report reiterated EMCF "is and remains a very dangerous prison. Inmate housed there are at significant risk of serious harm."[6] By 2018, Vail reported, "…due to the lack of adequate security staffing throughout the prison, EMCF remains an extraordinarily dangerous prison, and continues to place all prisoners at substantial risk of harm."[7] Defendants had *actual notice* of the substantial risk of harm to inmates, yet continued to operate EMCF with an insufficient number of officers and inadequately trained and unsupervised staff, resulting in harm and death to inmates, specifically Decedent.

18. In *Dockery*, Plaintiffs' psychiatric expert Dr. Terry Kupers provided a 2016 report, again placing Defendants on notice of systemic failures at EMCF. Dr. Kupers warned that conditions of EMCF's solitary confinement caused "psychiatric illness and lasting disability," noting segregation units operated with "shocking neglect by staff," where prisoners were left idle in dark cells without mental health care.[8] Dr. Kupers described segregation units as "inexcusably horrid," with seriously mentally ill prisoners trapped "with seemingly no way out," their conditions worsening due to staff neglect and lack of supervision.[9] Dr. Kupers concluded that EMCF's conditions in solitary were the worst he had seen in 40 years, pressing "the outer bounds of what most humans can psychologically tolerate."[10]

---

[5] *Dockery*, Expert Report of Eldon Vail (June 16, 2014), ¶ 19.
[6] *Dockery*, Expert Report of Eldon Vail (December 29, 2016), ¶ 22.
[7] *Dockery*, Expert Report of Eldon Vail (November 16, 2018), ¶ 15
[8] *Dockery*, Expert Report of Terry Kupers, M.D., M.S.P. (December 29, 2016), pp.1-2, 60.
[9] *Dockery*, Expert Report of Terry Kupers, M.D., M.S.P. (December 29, 2016), pp.17-18.
[10] *Dockery*, Expert Report of Terry Kupers, M.D., M.S.P. (December 29, 2016), pp.2, 60.

19. In 2017, MTC's corporate spokesperson and former Regional Vice President, Marjorie Brown, testified that staff must conduct security checks every 30 minutes.[11] Policy required officers to visually confirm a *living*, breathing person during each count,[12] and all counts were required to be documented in a Count Log and/or a "Unit Register," a log documenting all events within a housing unit on a continuous 24-hour basis.[13]

20. MTC and MDOC policies and procedures define various count types (shift change, certified, formal, informal) and frequencies. Per MDOC policy, "all certified, formal, and informal counts," were to be documented in a Count Log. MTC and MDOC policy required certified counts at 0700, 1400, and 2400 hours,[14] "at every shift change and other specified times…verified in writing by two or more staff on a certified count slip."[15] Formal counts were "scheduled counts logged in Unit Registers for forwarding to Area Control Centers,"[16] to be completed hourly between 0200 and 0700 hours, and at 1000, 1200, 1600, 1900, 2200, and 2400 hours.[17] Informal counts were "unscheduled…between formal and certified counts to ensure offender accountability and disrupt patterns which would enable offenders to time escape,"[18] and occurred in 30 minute intervals. All counts and checks must be documented in logbook and count slips[19] as mandatory security procedure.[20]

21. Defendants had prior notice of systemic failures including understaffing and use of solitary, and the direct connection between such conditions to serious mental health deterioration

---

[11] *Gipson*, Deposition of Marjorie Brown, p.30 lines 17-18.
[12] *Gipson*, Deposition of Marjorie Brown, p.35 lines 7-25, p.36 lines 1-25.
[13] *Gipson v. Management & Training Corporation et al*, S.D. Miss., No. 3:16-cv-00624.
[14] *Gipson*, Deposition of Marjorie Brown, p.34 lines 1-4.
[15] MDOC SOP 16-06-1 Offender Count.
[16] MDOC SOP 16-06-1 Offender Count.
[17] MDOC SOP 16-06-1 Offender Count.
[18] MDOC SOP 16-06-1 Offender Count.
[19] *Gipson*, Deposition of Marjorie Brown, p.44 lines 1-19.
[20] MDOC SOP 16-06-1 Offender Count.

and preventable inmate deaths. Dr. Kupers' 2016 expert report focused on psychiatric effects of solitary confinement in segregation units at EMCF (Units 5 and 6, Medical & Intake Units), which concluded that (1) solitary confinement caused severe psychological harm; (2) solitary confinement of prisoners with serious mental illness exacerbated psychiatric conditions; (3) solitary conditions were harsh and inhumane, with aggravating factors such as staff neglect and inadequate medical/mental health care; (4) Medical and Intake Units were *de facto* long-term isolation housing without recreation or treatment and were damaging to inmates with serious mental illness; and (5) overall, EMCF's solitary conditions were the worst Dr. Kupers had seen in 40 years, "press[ing] the outer bounds of what most humans can psychologically tolerate."[21] Prisoners in isolation had almost no human contact and were deprived of access to meaningful activity. Staff were inattentive to prisoners' basic human needs.[22]

22. Dr. Kupers emphasized that these conditions were a direct product of systemic understaffing. He found that "shocking neglect by staff" left prisoners languishing in darkness without basic necessities or supervision,[23] and both prisoners and staff reported the same failures: absence of security checks, inattentiveness to psychiatric crises, and medical/mental health neglect.[24] These findings confirmed that Defendants were on notice, years before Decedent's death, that chronic understaffing created an extraordinarily dangerous prison environment.

23. Despite repeated warnings, including those in numerous expert reports, Defendants continued to understaff EMCF with unqualified, poorly trained, and unsupervised guards.

---

[21] *Dockery*, Expert Report of Terry Kupers, M.D., M.S.P. (December 29, 2016).
[22] *Dockery*, Expert Report of Terry Kupers, M.D., M.S.P. (December 29, 2016), ¶ 80.
[23] *Dockery*, Expert Report of Terry Kupers, M.D., M.S.P. (December 29, 2016), pp.1-2.
[24] *Dockery*, Expert Report of Terry Kupers, M.D., M.S.P. (December 29, 2016), pp.8-9, 17-18.

The result was a predictable and preventable pattern of inmate harm, psychiatric breakdown, and death. Defendants were objectively and subjectively aware of chronic understaffing failures and the predictable harm they caused. Yet, with deliberate indifference to the safety and well-being of inmates at EMCF, Defendants ignored these warnings and failed to protect inmates from harm or death, and placed Decedent, a prisoner with schizophrenia and mental health needs, in an unsupervised segregation cell. As a direct and foreseeable result, Demetrios Washington died alone in his cell, due to the systemic dangers Defendants had been warned of for over a decade. As a result, Plaintiff suffered damages.

### *Demetrios Washington's Death*

24. Plaintiff incorporates all allegations in Paragraphs 1 through 23 hereinabove.

25. According to reports, correctional officers found Decedent unresponsive in his cell in Housing Unit 7 ("HU7"), at approximately 1637 hours. Video footage showed officers discovered Decedent unresponsive in his cell at approximately 1305 hours.

26. Upon information and belief, Defendants failed to properly conduct inmate counts and security rounds in HU7, or Camp Support, on June 29, 2023. Logbooks and video footage from HU7 on June 29, 2023, showed a gap of *over two (2) hours* between security checks or inmate counts, though policy mandated informal checks every 30 minutes.

27. Throughout Decedent's incarceration, he experienced numerous mental health episodes and assaults. Decedent had an extensive and well-documented history of mental illness and diagnosis of schizophrenia. Defendants had knowledge of Decedent's mental health history from his medical records. Despite knowledge of Decedent's history coupled with prior notice of the damage inflicted by solitary confinement upon those with serious mental

illness, Defendants still housed Decedent alone in isolation under conditions described as "shockingly harsh and inhumane."[25]

28. Defendants failed to properly conduct inmate counts and security rounds as required, resulting in Decedent's death. Video footage confirmed that one (1) official count was conducted in HU7 at approximately 09:13 on June 29, 2023. Officers checked inmates in HU7 merely one (1) time in nearly eight (8) hours.

29. Beyond failing to conduct mandatory counts on June 29, 2023, Defendants improperly conducted the informal count at 10:56 a.m. Video footage confirmed officers stopped at every cell *except* Decedent's, thus failed to verify Decedent's well-being. Another informal count occurred at 13:39 hours—over two and half hours later—during which, Decedent was discovered unresponsive.

30. Video footage showed officers left HU7 after they found Decedent unresponsive with his face in the toilet inside his cell. Shortly afterward, video footage captured multiple people entering HU7 and Decedent's cell. Decedent was carried into the doorway where compressions began. A stretcher was brought into HU7 and then removed. Decedent was carried out of HU7 by his feet and armpits.

31. Correctional officers were required to personally observe inmates, including Decedent, at least every 30 minutes on an irregular schedule.[26] Inmates who were violent or mentally disordered or who demonstrated unusual or bizarre behavior were required more frequent observation; suicidal inmates were under continuous observation.[27] Merely standard

---

[25] *Dockery*, Expert Report of Terry Kupers, M.D., M.S.P. (December 29, 2016), pp.1, 17-18.
[26] *See* MDOC Policy 19-01 Offender Segregation, ACA Standard 4-4257.
[27] *See* MDOC Policy 19-01 Offender Segregation, ACA Standard 4-4257.

      supervision, not to mention heightened supervision required for inmates with history of mental disorders and/or suicidal behavior, would have prevented Decedent's death.

32. As per its *de facto* policy, EMCF was understaffed on June 29, 2023. MTC has a pattern and practice of understaffing its prisons, specifically EMCF. Prior lawsuits against MTC demonstrated that understaffing placed staff and inmates at risk of harm and death. Despite such knowledge, MTC continued to understaff the facility, resulting in Decedent's death.

33. Had Defendants adequately staffed EMCF with qualified, trained, and supervised officers – or simply officers who conducted counts and rounds as required by policy – on June 29, 2023, Decedent would have been found prior to 1339 hours, and Decedent would have received necessary medical/mental health care and treatment. Instead, Decedent was left alone in a cell for hours. As a result of Defendants' failure to protect inmates from harm by their refusal to sufficiently staff EMCF with adequately trained and supervised officers, Decedent died. Such actions were negligent, grossly negligent, and with a deliberate indifference to the safety of inmates, specifically Decedent.

## § 1983 CAUSES OF ACTION:

34. Plaintiff incorporates all allegations in Paragraphs 1 through 33 hereinabove.

35. Defendant MTC had the responsibility and duty to supervise, oversee, and control the training and job performance of staff, as well as the daily operations of EMCF. Defendants had a duty to ensure that EMCF was maintained in a safe condition, suitable for human occupation and compliant with constitutional requirements. Defendants had the duty to ensure that officials acted in compliance with the laws and Constitutions of both the State of Mississippi and the United States and did not deprive inmates of their rights guaranteed under the United States Constitution and laws. This included the duty to ensure conditions

of confinement did not impose what may constitute cruel and unusual punishment.

36. By and through Defendants' deliberate indifference to the safety of Decedent on or about June 29, 2023, and establishment of customs, policies, and practices which created unconstitutional conditions of confinement, Defendants MTC and Does 1-100 violated the clearly established constitutional rights of Decedent, including but not limited to:

   a) Right to be free from cruel and unusual punishment under the 8th and 14th Amendments.

   b) Right not to be deprived of liberty without due process of law.

   c) Right to be safe and protected from harm while in Defendants' custody.

   d) Right to timely and adequate medical treatment.

37. Defendants John Doe 1-100's actions were not objectively reasonable. At all times relevant, Doe Defendants were acting under the color of state law.

38. As a direct and foreseeable result of Doe Defendant 1-100's actions, Decedent died, and Plaintiff suffered damages, including but not limited to Decedent's emotional distress, mental anguish, pain and suffering, Decedent's death, and wrongful death beneficiaries' damages under the Wrongful Death Statute and the Survival Statute.

39. Defendant MTC, by and through Doe Defendants in their individual and official capacities, established customs, policies, and procedures which directly and proximately caused the deprivation of Decedent's constitutional rights as alleged herein. Defendants were deliberately indifferent to the safety of Decedent and other EMCF inmates. MTC maintained and operated EMCF in such a manner that the conditions of confinement resulted in a comprehensive and pervasive pattern of serious deficiencies in providing for the basic human needs of the inmates housed at EMCF in every respect.

40. Such unwritten policies, customs, and practices include but are not limited to:

    a)    Failing to adequately staff EMCF with trained and qualified guards assigned to the housing units and allowing EMCF to be understaffed.

    b)    Inadequate or improper procedures, policies, and practices for identifying and taking appropriate action against correctional officers in need of re-training, corrective measure, reassignment, or other non-disciplinary actions, through a positive or early warning system designed to prevent violations of inmates' rights.

    c)    Failing to establish policies and procedures to limit the flow of illegal contraband into the facility, including but not limited to drugs, weapons, and cell phones, all of which contributed to the atmosphere of violence at EMCF.

    d)    Failing to make proper rounds/cell checks within the established guidelines to ensure inmates' safety.

    e)    Improper classification and housing of inmates, including failure to adequately classify and house inmates with mental health disorders and/or suicidal behaviors.

    f)    Regularly denying and delaying access to timely and adequate medical care and treatment, including life-saving medical assistance.

41.    Upon information and belief, MTC, through Doe Defendants 1–100, had prior knowledge that Decedent was at risk of harm or death and failed to take steps to prevent it. As a direct and foreseeable result of the actions and inactions of Defendants MTC and Doe Defendants 1-100 to take necessary steps to protect Decedent from harm, Demetrios Washington died, and Plaintiff suffered damages.

42.    Correctional officers, including Doe Defendants, acted, or failed to act, in accordance with official policies, customs, and practices of MTC, or at the direction of, and with the approval of these officials, in depriving Decedent of his rights as described herein. The policies, practices, and customs were the moving force behind Defendants and its employees' actions and inactions, in violation of Decedent's constitutional rights, welfare, and safety, and demonstrate deliberate indifference to Decedent's safety and well-being.

43.    From Defendants MTC and Doe Defendants 1-100, jointly and severally, Plaintiff seeks recovery of all compensatory and punitive damages to which the Estate of Demetrios

Washington is entitled as a result of the conditions of confinement, and damages suffered therefrom.

## **NEGLIGENCE/GROSS NEGLIGENCE**

44. Decedent incorporates all allegations in Paragraphs 1 through 43 hereinabove.

45. At all times relevant, Defendant MTC and Doe Defendants, as their employees, had a duty to exercise ordinary care for EMCF prisoners, including Decedent. MTC and Doe Defendants breached that duty by failing to use ordinary care that a reasonable person would use to avoid and prevent injury to others, *i.e.* in the case *sub judice*, provide appropriate, reasonable, necessary supervision to avoid and prevent injury – the failure of which led directly to Decedent's death. This breach was so egregious as to amount to gross negligence.

46. Defendants and their employees were also negligent in failing to monitor Decedent's cell and/or Housing Unit 7, or Camp Support, on a routine basis, and failing to conduct inmate counts and security checks as required. Defendants failed to provide appropriate, reasonable, and necessary supervision to avoid and prevent harm to inmates, specifically Decedent. Defendants understaffed EMCF and did not manage its population of mentally ill inmates with adequate or trained or qualified guards.

47. Had Defendants performed security checks in accordance with policy, Decedent would have been discovered in time to render medical assistance. Instead, Defendants did not conduct security checks as required to avoid and prevent injury to others, and as a result, Decedent died.

48. Decedent's death was the reasonably foreseeable outcome of Defendants' and their employees' acts and omissions. These acts and/or omissions were substantial factors in causing Decedent's death, and the accompanying damages suffered by Plaintiff.

## NEGLIGENT HIRING AND SUPERVISION

49. Decedent incorporates all allegations in paragraphs 1 through 48 hereinabove.

50. Plaintiff alleges Defendant MTC negligently, or with gross negligence, hired, supervised, and retained its employees and agents, *inter alia*, by a) failing to care for and ensure Decedent's health, safety and well-being while at EMCF; b) failing to properly train, supervise, discipline, retain, hire and/or discharge its employees, agents, and/or representatives; and c) were otherwise negligent or grossly negligent in their care and safety of Decedent, and as a direct and proximate result, Plaintiff suffered damages alleged herein.

## RESPONDEAT SUPERIOR

51. Decedent incorporates all allegations in Paragraphs 1 through 50 hereinabove.

52. Defendant MTC and Doe Defendants 1-100 acted with negligence, gross negligence, and/or intentionally by allowing or failing to prevent Decedent's death. At all times relevant, Defendant owed a duty to Decedent to ensure his health, safety, and well-being, and Defendants breached this duty. The actions and inactions of Defendant MTC and/or Doe Defendants led directly to Decedent's death and injuries suffered by Plaintiff. MTC, as Doe Defendants' employer, is liable for its employees' actions which were undertaken during the course and scope of their employment.

## PUNITIVE DAMAGES

53. Decedent incorporates all allegations in Paragraphs 1 through 52 hereinabove.

54. Defendant MTC and Doe Defendants 1-100 acted in complete and reckless disregard for Decedent's safety by acting in a negligent and/or grossly negligent manner and/or by engaging in conduct that was in willful violation of Decedent's constitutional rights, as previously described herein. The actions of these Defendants warrant punitive damages.

55. Defendants' actions exhibited gross negligence and direct disregard for the safety of Decedent. Defendants' tortious actions caused Decedent's wrongful death, and Plaintiff's damages. Accordingly, punitive damages should be awarded against Defendants.

## **PRAYER FOR RELIEF**

Plaintiff prays that upon a jury trial of this cause, the Court will award all relief due Plaintiff and the Estate of Demetrios Washington as set forth herein, including but not limited to the following relief:

A. Compensatory damages of, from and against the Defendants, each and severally, in the amount to be determined by a jury at trial,

B. Punitive damages of, from, and against the Defendants, in their individual capacities, in an amount to be determined by a jury at trial,

C. Payment of funeral and burial expenses,

D. Reasonable attorney's fees and all costs of this court,

E. Pre- and post-judgment interest, and

F. Such other general and specific relief as appears reasonable and just in this cause.

RESPECTFULLY SUBMITTED, THIS the 16th day of September 2025.

MITCHELL WASHINGTON

BY: _____
COURTNEY D. SANDERS

MERRIDA (BUDDY) COXWELL (MB# 7782)
COURTNEY D. SANDERS (MB# 106444)
**COXWELL & ASSOCIATES, PLLC**
500 North State Street
Jackson, Mississippi 39201
Telephone: (601) 948-1600
Facsimile: (601) 948-7097
merridac@coxwelllaw.com
courtneys@coxwelllaw.com

Charles R. (Chuck) Mullins (MB# 9821)
**MULLINS LAW FIRM**
1146 Lyncrest Avenue
Jackson, Mississippi 39202
Telephone: (769) 216-8373
chuck@chuckmullinslaw.com

*Attorneys for Plaintiff*